T.C. Memo. 1999-241


UNITED STATES TAX COURT


PLAINS PETROLEUM COMPANY AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25636-96.                 Filed July 23, 1999.


<u>David D. Aughtry</u>, <u>Shelley J. Cashion</u>, <u>Arnold B. Sidman</u>, and
<u>Craig M. Bergez</u>, for petitioners.

<u>William L. Blagg</u> and <u>Mark S. Mesler</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>: Respondent determined deficiencies in
petitioners Federal income tax and accuracy-related penalties as
follows:

|       |             | Penalties   |
| Year  | Deficiency  | Sec. 6662   |
|-------|-------------|-------------|
| 1991  | $3,009,338  | $601,868    |
| 1992  | 1,704,166   | 340,833     |
| 1993  | 605,629     | 121,125     |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  After concessions by the parties, the issues we must decide are:  (1) Whether an acquisition by petitioner was made for the principal purpose of avoiding or evading tax as defined by section 269(a), and (2) whether petitioner is liable for accuracy-related penalties pursuant to section 6662(a).  References to petitioner in the singular are to Plains Petroleum Company.

FINDINGS OF FACT

Pursuant to Rule 91, some of the facts have been stipulated for trial, which stipulations are incorporated herein by reference and are found as facts in the instant case.  When petitioner filed the petition, its principal place of business was located in Denver, Colorado.  Petitioner is the common parent of an affiliated group of corporations that filed consolidated Federal income tax returns for the years in issue.  Petitioners are engaged in the oil and gas business.

I.   Petitioner and Tri-Power Before the Acquisition

  A.   Petitioner

    1.   Organization and Operations

Petitioner was incorporated on November 30, 1983, as a wholly owned subsidiary of KN Energy, Inc. (KN Energy), a publicly traded company.[1]  Effective October 1, 1984, KN Energy assigned its ownership interests in substantially all of its then-remaining oil and natural gas producing properties to petitioner.[2]  On September 13, 1985, as the result of a spinoff, petitioner became an independent, publicly owned company.  Stock

---

[1]    KN Energy, Inc. (KN Energy), was formed in 1936 as a pipeline company to purchase supplies of natural gas in the Otis field in central Kansas and deliver those supplies through a single transmission line to markets in northern Kansas and central Nebraska.

[2]    KN Energy had previously spun off a portion of its assets pursuant to a plan to thwart a 1983 takeover attempt.  During 1983, KN Energy had two types of natural gas reserves, (1) "old" natural gas reserves (natural gas reserves associated with wells drilled before July 1, 1978), and (2) "new" natural gas reserves (natural gas reserves associated with wells drilled on or after July 1, 1978).
     As a defensive mechanism to the 1983 takeover attempt, KN Energy decided to spin off its oil and natural gas reserves.  KN Energy accomplished the spinoff using two subsidiaries, Midlands Energy Co. (Midlands) and petitioner.  The first spinoff took place on Dec. 13, 1983, after KN Energy transferred its new natural gas reserves and undeveloped properties to Midlands.  The second spinoff was delayed because transfer of KN Energy's old natural gas reserves, which were subject to regulation by the Federal Energy Regulatory Commission (FERC), required FERC approval which had not yet been sought.  On Jan. 29, 1985, FERC issued an order approving the Oct. 1, 1984, transfer of the remaining oil and old natural gas reserves to petitioner.

in petitioner began trading on the New York Stock Exchange on September 16, 1985.

After the spinoff, petitioner's holdings consisted primarily of properties that produced "old" natural gas (i.e., those with wells that had been drilled prior to July 1, 1978).[3] The properties were located primarily in the Hugoton field in southwest Kansas and in the Guymon-Hugoton area of Oklahoma (collectively referred to as the Hugoton field or Hugoton).[4] At the time of the spinoff, petitioner was required by contract to sell substantially all (approximately 90 percent) of its natural gas production to KN Energy at an average sales price of 53 cents per thousand cubic feet (Mcf).[5] In addition, KN Energy had a contractual first right of refusal to purchase any additional gas supplies that petitioner might acquire or develop in the future. Essentially, petitioner had one field (Hugoton), one product (old natural gas), and one customer (KN Energy).

_____

[3] Petitioner, however, also held (1) a few properties that produced some oil along with old natural gas, (2) some properties that produced new natural gas, and (3) a small amount of undeveloped acreage.

[4] The Hugoton field in Kansas and the Guymon-Hugoton field in Oklahoma are essentially one continuous field that straddles the border between Kansas and Oklahoma.

[5] KN Energy serves a predominantly rural market, providing gas for space heating purposes. Accordingly, KN Energy's market is highly sensitive to weather conditions.

During 1986, petitioner's executive management team consisted of Elmer J. Jackson as its chief executive officer (CEO), Roger L. Billings as its chief operating officer (COO), Darrel Reed as its vice president of finance, and Robert W. Wagner as its land manager.[6] Mr. Billings, a petroleum geologist, and Mr. Wagner each had over 30 years of experience in the oil and gas business when they joined petitioner during 1985. Robert Miller served as petitioner's general counsel.[7] Petitioner's board of directors (board) was composed of Mr. Jackson, Mr. Billings, and three individuals who were not involved with petitioner's management.

Petitioner was subject to the regulatory control of both the Kansas Corporation Commission (KCC), a State agency, and the Federal Energy Regulatory Commission (FERC). The KCC had regulatory control over the production and development of the Hugoton field. At the time petitioner became public, the KCC had

---

[6]    Mr. Jackson, an attorney with over 30 years of experience in the oil and gas business, joined petitioner at KN Energy's request prior to the Sept. 13, 1985, spinoff. Mr. Jackson joined KN Energy in 1952 as an attorney after working 4 years for a major oil company. During the spring of 1984, Mr. Jackson left KN Energy to serve as Midlands' executive vice president and general counsel until it was acquired, during December 1984, by Freeport McMoRan, Inc. Then, prior to the Sept. 13, 1985, spinoff of petitioner, KN Energy asked Mr. Jackson to return to KN Energy to serve as petitioner's CEO.

[7]    Like Mr. Jackson, Mr. Miller began his legal career with KN Energy.

under its consideration a proposal to allow "infill drilling"[8] in the Hugoton field.  In its third quarterly report dated September 30, 1985 (1985 third quarter report), the first shareholder report issued by petitioner after its spinoff from KN Energy, petitioner indicated that it expected that infill drilling would, if allowed, add approximately 31 percent to its proven[9] natural gas reserves.  Petitioner further anticipated that, as a result of deregulation, it could expect to receive a price for those reserves that would be between three and four times the average price it was then receiving for its production from the Hugoton field.  On April 24, 1986, the KCC issued an order that permitted infill drilling by petitioner in the Hugoton field beginning on January 1, 1987 (the KCC infill drilling order).  On November 18, 1986, petitioner announced that it would receive $1.63 per Mcf for infill gas production from the Hugoton field.  The KCC infill drilling order in the Hugoton field was challenged[10] but ultimately affirmed by the Kansas Supreme Court on January 20,

---

[8]    An "infill well" is defined as "A well drilled on an irregular pattern disregarding normal target and spacing requirements."  Williams & Meyers, Oil & Gas Terms 529 (9th ed. 1994).

[9]    The term "proven" or "proved" reserves is frequently used to denote the amount of oil in known deposits which is estimated to be recoverable under current economic and operating conditions. See id.

[10]    Mobil Oil and other interested parties contested the KCC infill drilling order in the Hugoton field.

1989.  See <u>Southwest Kansas Royalty Owners Association v. Kansas Corporation Commn.</u>, 769 P.2d 1 (Kan. 1989).

FERC also had regulatory control over the production and sale of old natural gas from the Hugoton field.  During June 1986 FERC issued Order 451, 51 Fed. Reg. 22168 (June 18, 1986) (FERC Order 451), which permitted, but did not require, gas pipelines and producers to renegotiate the price of old natural gas with the purchase price not to exceed $2.57 per Mcf.  FERC Order 451 was hotly contested.  The Court of Appeals for the Fifth Circuit in <u>Mobil Oil Exploration & Producing Southeast, Inc. v. FERC</u>, 885 F.2d 209 (5th Cir. 1989), struck down FERC Order 451 as exceeding FERC's authority.  During 1991, however, the Supreme Court upheld FERC Order 451 in <u>Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos.</u>, 498 U.S. 211 (1991).

During 1986, pursuant to FERC Order 451, petitioner and KN Energy renegotiated the purchase price for petitioner's production of old natural gas from the Hugoton field.  Subject to a judicial determination of the validity of FERC Order 451, petitioner and KN Energy established a 1987 price of $1.40 per Mcf.  In addition, KN Energy agreed to reimburse petitioner, in full, for the production and property taxes on petitioner's Hugoton production.  The increased revenues that petitioner expected to receive from the renegotiated gas sales were, of

course, subject to refund until the appeals of FERC Order 451 became final.

2. <u>Acquisition Strategy and Efforts Before the Acquisition</u>

a. <u>Publicly Announced Acquisition Policy</u>

During 1986, petitioner's gas reserves were projected to last for approximately 25 years. Oil and natural gas reserves are, however, by their very nature depleting assets. Because oil and natural gas reserves are nonregenerative, they must be replaced either through exploration and development or by acquisition. Petitioner's board and management team elected, from the outset, to replace production and add reserves through acquisition. In petitioner's 1985 third quarter report, Mr. Jackson wrote a letter to the shareholders announcing petitioner's acquisition plans as follows:

> Although the decrease in oil and gas prices has not significantly affected your Company's earnings, it has affected the industry in general. <u>Plains sees the drop in other companies' values as a strategic opportunity to make a profitable acquisition that will expand its size and area of operations</u>. [Emphasis added.]

Similarly, in petitioner's first annual report, issued for the year ended December 31, 1985, Mr. Jackson again publicly announced petitioner's acquisition plans. In a letter to the shareholders, Mr. Jackson stated:

> <u>Your management also is taking steps to develop additional reserve sources and new markets</u>. The fact that substantially all of our properties are developed

and are producing gas dedicated to the KN Energy, Inc. (KN) system has two inevitable consequences. The first is that our sales of gas are directly affected by weather conditions on the KN system in the Midwest and High Plains. With space heating as the primary service, gas sales revenues from KN will vary from season to season and year to year. The second consequence is that <u>with essentially all of our acreage already developed (except for the infill program described above), we must replace the gas reserves that are sold each year</u>.

<u>In developing new supplies we will not neglect the KN market, but will endeavor to develop others as well. Initially, we are looking to do this principally by acquisition. The current weak conditions in the industry and our strong financial base offer the possibility of favorable acquisitions which we are continuing to explore</u>. [Emphasis added.]

Later in the 1985 annual report, petitioner identified the States in which it sought to acquire producing properties and developmental opportunities, as well as the buying opportunity it perceived going into 1986, as follows:

The Company is focusing on the development opportunities of its properties, and has only minor amounts budgeted for exploration. <u>The Company is seeking to acquire producing properties and developmental opportunities in Texas, Oklahoma and Louisiana so as to diversify geographically and enter new markets</u>. The Company believes that the sharply lower oil and gas prices represent a buying opportunity; however, it does not look for prices to recover in the next year or two. [Emphasis added.]

Upon becoming public, petitioner immediately began looking for acquisition opportunities. During the fall of 1985, petitioner commissioned its investment banking firm, Kidder, Peabody & Co. (Kidder Peabody), to do, inter alia, an acquisition

earch.  Petitioner obtained a report from Kidder Peabody, dated November 12, 1985, in which Kidder Peabody identified 33 oil and gas companies as potential acquisition targets.  The Kidder Peabody report selected 8 of the 33 potential targets for further review.

The Kidder Peabody report and petitioner's acquisition plans were discussed at the November 15, 1985, meeting of petitioner's board.  According to the minutes of that board meeting:

> Mr. Jackson explained the reason why the Company was currently looking for an acquisition.  He stated that if the Kansas Corporation Commission were to order no infill drilling in the Hugoton field in 1986 or even in 1987, then the Company must do more than sell its inventory off the shelf, but must look for ways to maintain its reserve position.  Management had concluded that currently the best opportunities to add reserves would be found through the purchase of an oil and gas exploration and production company, rather than through the process of building an exploration position from the ground up.  Mr. Jackson advised that Mr. Billings and Mr. Reed had been actively reviewing many potential candidates, and that Kidder Peabody had provided research assistance on acquisitions candidates.  Mr. Jackson stressed that the Company would consider nothing other than a friendly acquisition.  The characteristics of the ideal acquisition candidate were discussed in detail. [Emphasis added.]

Petitioner regularly reported on its acquisition efforts at its board meetings.  Petitioner also reported on its acquisition efforts, reiterating its commitment to add value through its oil and gas acquisition strategy, in every quarterly shareholder and annual report during the period 1986 through 1990.

b.   Acquisition Limitations

During this period, Mr. Billings formed an in-house acquisition screening team consisting of himself, Mr. Wagner, Mr. Reed, Mr. Miller, and Lee Van Ramshorst, a petroleum engineer. Petitioner's management team adopted certain limitations for screening and selecting acquisition targets.  In particular, petitioner was looking for companies with significant oil and gas reserves.  Further, petitioner sought both geographic and geologic diversification.  Petitioner wanted to (1) expand outside of the Hugoton field into the Gulf Coast region, and (2) broaden its production mix by acquiring more oil reserves.  With an initial line of credit in the amount of $25 million, petitioner decided to target acquisitions in the range of $10 to $25 million.  Management decided to make smaller acquisitions in order to spread the risk and avoid betting the entire company on a single acquisition.  Finally, petitioner hoped to gain, by way of acquisition, access to otherwise unavailable proprietary information, which is critical in the oil and gas exploration and production business.  Proprietary information, generally available only to owners with a working interest in a field, helps the owner/producer make decisions concerning whether to pursue additional working interests or pull out of that field.

The use of reserve reports in connection with the purchase and sale of oil and gas reserves is a common practice.  A reserve

report typically states the discounted net present value of the specified reserves. The discounted net present value is dependent upon three factors: (1) An estimate of the proved, developed, and producing reserves, (2) an estimate of the anticipated future net revenue using price forecasts provided by the oil and gas company, and (3) a range of discount rates used to determine the net present value of the future net revenues expected to be received upon the recovery and sale of the reserves. Petitioner's standard practice was to rely on the seller's reserve report if it was prepared by a reputable outside engineer.[11] Petitioner's standard practice also included engaging the seller's reserve engineer to update or "roll forward"[12] his earlier projections using petitioner's oil and gas price forecasts.[13] Petitioner would then perform an in-house review of the updated reserve report in connection with its evaluation of the prospective acquisition. Petitioner adopted

---

[11] The "major" oil and gas companies typically do not rely on outside engineers. Thus, in acquisitions involving reserves owned by major oil and gas companies, it is common for a buyer to rely on the seller's in-house reserve report.

[12] A reserve report is "rolled forward" or updated by revising the previous projections to take into account the intervening production and the buyer's oil and gas price forecast.

[13] Petitioner also used rollforwards in connection with the evaluation of its own reserves. Petitioner typically evaluated its reserves midyear and then rolled its projections forward at the end of the year.

this practice because its management believed that it was more efficient to use the existing data, produced by an engineer already familiar with the reserves, than to start back at square one, with an independent reserve engineer who was unfamiliar with the properties.

### c.   Attempted and Failed Acquisitions

From the time it became public until the acquisition of Tri-Power Petroleum, Inc. (Tri-Power), during November 1986, petitioner's management team contemplated a large number of acquisition opportunities.  During 1986, they considered over 40 acquisition targets.  Several of those companies did come on the market, but petitioner was unsuccessful in acquiring them either because the price was too high or because they were already committed before petitioner had the opportunity to make an offer.

During January 1986, Petitioner opened discussions relating to the acquisition of Brock Exploration Co. (Brock Exploration), an oil and gas company headquartered in New Orleans, Louisiana. Brock Exploration was owned and operated by Lawrence E. Brock, a longtime friend of Mr. Jackson.  Negotiations with Brock Exploration progressed through the summer and fall of 1986. During that time, however, petitioner's acquisition efforts continued.

During March 1986, Messrs. Billings and Wagner met on a number of occasions with representatives from Kennedy & Mitchell

(KM), an oil and gas company located in Lakewood, Colorado. Petitioner pursued the acquisition and investigated KM's reserves. In investigating the reserves, petitioner analyzed the report prepared by KM's reserve engineers without investing the time and expense of commissioning a new reserve report from a new petroleum engineering firm. Petitioner's board, at its March 7, 1986, meeting, discussed and authorized an offer for the KM properties located in the States of Oklahoma and Texas at a price not to exceed $10.6 million. The price proposed by petitioner for the KM properties was not acceptable to the seller, and the acquisition failed. At petitioner's next board meeting on May 8, 1986, Mr. Billings reported on the failure to make the authorized acquisition and the ongoing search for an oil and gas acquisition within the limitations set by the board:

> Mr. Billings advised that the Company had been unsuccessful in acquiring those properties which had been shown to the Board of Directors at the last regular meeting. Although there is no current follow-up activity on that prospect, Mr. Billings advised that the properties may remain available for purchase, and that, at a later date in 1986, the party owning those properties may be more inclined to sell them. Otherwise, Mr. Billings advised that the Company continues to look for an attractive acquisition within the parameter earlier defined for the Board. Currently, there are no candidates for acquisition which are appropriate to bring before the Board. [Emphasis added.]

During petitioner's discussions with Mr. Brock concerning Brock Exploration, Mr. Brock identified several other acquisition

opportunities. One of those was Equitable Oil, a potential acquisition target that had also been recommended to petitioner by its investment banking firm, Kidder Peabody. During June 1986, Mr. Jackson traveled to New York to meet with Equitable Oil's management. Consideration of the acquisition of Equitable Oil, however, was deferred until the conclusion of the Brock Exploration deal.

At the August 8-9, 1986, meeting of petitioner's board, Mr. Billings reported on petitioner's ongoing acquisition efforts, including two specific targets:

> Mr. Billings reviewed the status of acquisition activities including a general description of two potential acquisition candidates that are currently being evaluated by the Company's staff and outside consultants. Mr. Billings indicated that because the process of gathering information on these acquisition candidates had not been completed, no specific proposals would be brought before the Board at this time. Mr. Billings indicated, however, that a recommendation with respect to at least one candidate should be finalized in the next few weeks.

Sometime during the summer of 1986, as negotiations with Brock Exploration continued, petitioner commissioned an independent petroleum engineering firm to prepare a reserve report relating to Brock Exploration's reserves. Mr. Jackson directed petitioner to engage an independent reserve study for the Brock Exploration acquisition because he wanted to avoid any appearance that his longtime friendship with Mr. Brock, the owner of Brock Exploration, influenced the transaction. On September

9, 1986, petitioner's management team recommended to its board that an offer be made to acquire Brock Exploration in exchange for common stock of petitioner. By resolution dated September 9, 1986, petitioner's board authorized an offer of petitioner's common stock having a fair market value between $7 million and $10 million in exchange for 100 percent of Brock Exploration. Although Brock Exploration had net operating losses (NOL's), petitioner's offer did not include consideration for those losses. On September 16, 1986, Messrs. Jackson, Billings, and Reed met in New Orleans, Louisiana, with Mr. Brock to discuss petitioner's offer to acquire Brock Exploration. Petitioner's offer was rejected, and the Brock Exploration deal died.

When the Brock Exploration acquisition fell through, Mr. Jackson reopened communications with Equitable Oil. Discussions with Equitable Oil soon terminated, however, because it became apparent that petitioner could not offer enough to make the deal work.

During November 1986, prior to its acquisition of Tri-Power, petitioner's acquisition efforts were wholly unsuccessful.

3. Plans To Adopt a Holding Company Structure

It is common for publicly owned oil and gas companies to operate using a holding company structure (i.e., a parent company with an operating subsidiary). Shortly after its organization, petitioner's management team began considering the idea of

adopting a holding company structure for petitioner. By the summer of 1986, management concluded that a holding company structure would be the best structure for petitioner because it would offer petitioner greater flexibility in making acquisitions and in addressing shareholders and others with hostile intentions. Petitioner initially contemplated using one operating subsidiary. Petitioner contemplated that the Brock Exploration acquisition would be the vehicle for establishing the preferred holding company structure. Mr. Brock was interested in a stock transaction, the result of which would have been that Brock Exploration would have become a wholly owned subsidiary of petitioner, facilitating management's plan to adopt a holding company structure.

As the Brock Exploration transaction progressed into the summer of 1986, Mr. Jackson asked Paul Hocevar of Arthur Andersen & Co. (Arthur Andersen) to determine the tax consequences to petitioner if it transferred its oil and gas properties to a subsidiary. By memorandum dated June 25, 1986, Arthur Andersen transmitted a "discussion draft" memorandum that concluded favorable tax consequences would flow if petitioner formed a subsidiary and made an installment sale of its assets to the subsidiary. Arthur Andersen suggested this plan partially in response to management's concern about the possibility of a hostile takeover attempt. It was believed that the installment

sale would have the effect of a poison pill to a hostile bidder.[14]  The plan had no adverse tax consequences to petitioner.  Rather, in addition to creating a poison pill, the plan offered certain tax advantages.[15]  Petitioner obtained authorization to sell its assets to a newly formed subsidiary from the board at its August 1986 meeting.  Petitioner, however, never implemented that plan.

---

[14]    Arthur Andersen believed that the installment sale would act as a poison pill because acquisition of petitioner's stock by a hostile bidder would, if the hostile bidder made a sec. 338 election, trigger recognition of the unrecognized gain from the installment sale.  The resulting tax would effectively increase the cost to a potential hostile bidder trying to acquire petitioner.  In the absence of a sec. 338 election, the hostile bidder would derive no additional depletable tax basis in the gas reserves and would have little cost depletion in the future to offset the significant gas revenues that would be received.

[15]    According to the Arthur Andersen memorandum, the plan would yield an 18-percent after-tax benefit to petitioner.

4.  Market Conditions During 1986

During 1986, oil and gas prices were on the decline.[16]  At
the same time, the cost of drilling for oil and gas was on the
rise.  As a result, many oil and gas companies cut back their

------

[16]  The posted per-barrel price for West Texas Intermediate
Crude as of the beginning of each month during 1986 was as
follows:

| Month | Price |
|-------|-------|
| Jan. | $25.00 |
| Feb. | 23.00 |
| Mar. | 18.75 |
| Apr. | 15.00 |
| May | 13.25 |
| June | 14.00 |
| July | 14.00 |
| Aug. | 12.25 |
| Sept. | 14.25 |
| Oct. | 14.25 |
| Nov. | 14.25 |
| Dec. | 14.25 |

The posted per-Mcf price for gas as of the beginning of each
month during 1986 was as follows:

| Month | Price |
|-------|-------|
| Jan. | $2.00-2.25 |
| Feb. | 1.90-2.20 |
| Mar. | 1.80-2.15 |
| Apr. | 1.55-1.95 |
| May | 1.35-1.70 |
| June | 1.35-1.50 |
| July | 1.35-1.55 |
| Aug. | 1.40-1.55 |
| Sept. | 1.35-1.50 |
| Oct. | 1.25-1.45 |
| Nov. | 1.30-1.50 |
| Dec. | 1.35-1.50 |

exploration and development activities.  These two factors, declining prices and rising costs, combined to produce a highly competitive market for the acquisition of developed oil and gas reserves.

During 1986, Strevig & Associates (Strevig) was the leading publisher of oil and gas transactional data.  Strevig tracks oil and gas acquisitions, collecting all the available published information on completed transactions.  Upon confirmation of the data from both the buyer and the seller, Strevig publishes a quarterly report showing the median price per barrel of oil equivalent (price/BOE) paid by buyers in those transactions reported.

Gas reserves are converted to equivalent barrels of oil to provide a common unit of comparison when there is a mixture of oil and gas reserves.  The standard conversion ratio is 6000 cubic feet (cf) of gas to 1 barrel of oil.[17]  The price/BOE is determined by dividing the purchase price by the number of BOE acquired.

---

[17]   We note that the same conversion ratio is used in the Code. Sec. 613A(c)(4) equates 6,000 cubic feet (cf) of gas with 1 barrel of oil for purposes of computing the taxpayer's daily depletable natural gas quantity, which in turn is used in the computation of the taxpayer's allowance for depletion pursuant to secs. 611 and 613.

Strevig's quarterly reserve report for the fourth quarter of 1986 reports the following median price/BOE paid by buyers in those transactions followed by Strevig during 1986:

| Quarter | $/BOE | Number of Transactions |
|---------|-------|------------------------|
| First   | $5.41 | 37 |
| Second  | 5.00  | 23 |
| Third   | 5.33  | 33 |
| Fourth  | 6.45  | 55 |

Petitioner's acquisition of Tri-Power was among the 55 transactions reported by Strevig for the fourth quarter of 1986.

As reserve estimates are updated, Strevig revises its price/BOE computations and publishes those results.  During February 1990, Strevig reported the following revised price/BOE figures for those transactions followed by Strevig during 1986:

| Quarter | $/BOE | Number of Transactions |
|---------|-------|------------------------|
| First   | $5.41 | 37 |
| Second  | 4.97  | 23 |
| Third   | 4.41  | 33 |
| Fourth  | 5.18  | 55 |

B.  Tri-Power

Tri-Power, prior to November 18, 1986, was a wholly owned subsidiary of Tri-Power Petroleum Corp. (TPC), a publicly traded Canadian corporation.  Tri-Power owed, as of November 18, 1986, a total of $10 million ($5 million each) to the Toronto-Dominion Bank New York Branch and the Canadian Imperial Bank of Commerce

(the banks). Tri-Power also owed $46.5 million to its parent, TPC.

On November 18, 1986, pursuant to a Plan of Recapitalization, Tri-Power underwent a debt restructuring. Pursuant to the plan, Tri-Power issued 46,250 shares of preferred stock having a par value of $100 per share to each of the two banks in full satisfaction of Tri-Power's indebtedness to the banks. Also pursuant to the plan, Tri-Power issued 5,000 shares of preferred stock having a par value of $100 per share to TPC in full satisfaction of its intercompany debt to TPC. Accordingly, when petitioner acquired Tri-Power on November, 21, 1986, TPC owned 100 percent of Tri-Power's common stock and 5,000 shares of its preferred stock. Tri-Power's remaining shares of preferred stock were owned by the banks.

Tri-Power's principal place of business was in Houston, Texas, and its properties were located primarily in Texas and Wyoming. At the time of its acquisition by petitioner, Tri-Power owned seven groups of properties, six of which were acquired by way of merger (the properties owned by Tri-Power, and acquired by petitioner, will be referred to as the Tri-Power properties). Tri-Power's NOL's by that time were $84,817,122.

During 1986, Tri-Power began seeking investors to help develop seven different prospects in various locations throughout the Rocky Mountains, the Permian Basin, and the Gulf Coast.

Although it presented the investment package to numerous parties, Tri-Power failed to attract any investors.[18]  Sometime during July or August 1986, TPC decided sell Tri-Power in its entirety.

II.  Petitioner's Acquisition of Tri-Power

A.  TPC's Offer

Tri-Power first came to petitioner's attention about the time that the Brock Exploration deal collapsed.  Laura Dichter, an independent oil and gas landman out of Denver, Colorado, identified Tri-Power as a possible acquisition candidate for petitioner.  Sometime during early September 1986, Ms. Dichter delivered to Mr. Reed, petitioner's vice president of finance, a package of materials containing information about Tri-Power and its properties.  The package included the following:  (1) A list showing the average monthly production of Tri-Power's 79 producing wells for the first half of 1986, (2) excerpts from the February 17, 1986, L.A. Martin & Associates, Inc. (LAM), "Reserve Estimate and Economic Analysis" report, effective as of January 1, 1986 (the 1986 LAM reserve report), (3) LAM's updated production history curves (through June 1986), (4) monthly production statistics for each of Tri-Power's 79 wells from inception to the most recent information then available, (5) descriptions and locations for all of Tri-Power's leasehold

---

[18]  Although Tri-Power found no investors for its development proposal, it did sell one minor property during that period.

interests, both developed and undeveloped, (6) information concerning 4 major leased, but undrilled, prospects in which Tri-Power had an interest, (7) a list of Tri-Power's unleased, geologically-geophysically defined prospects, and (8) schedules showing Tri-Power's tax losses. Larry A. Martin, of LAM, was a well-known petroleum engineer.

During October 1986, Mr. Billings contacted Dwight Cassell, TPC's contact person with respect to the sale of its subsidiary, Tri-Power. Mr. Cassell, a petroleum geologist, served as Tri-Power's exploration manager. On October 2, 1986, following a telephone conversation with Mr. Cassell earlier that day, Mr. Billings wrote a letter to Mr. Cassell describing petitioner's objectives and intentions as follows: "Plains is seeking a Gulf Coast presence and hopes to seek property acquisitions from there. It will probably explore in only modest amounts in the current economic climate." By letter dated October 2, 1986, TPC offered to sell two of its subsidiaries, Tri-Power and Bonanza Petroleum, Inc. (Bonanza), to petitioner.

> The assets of Tri-Power and * * * [Bonanza] are being offered for sale. These assets include 100 percent of the stock of Tri-Power and Bonanza, which in turn represents ownership in producing oil and gas wells, non-producing prospective leaseholds, unleased oil and gas prospects plus office equipment and records. The data transmitted herewith provides the basis for determining worth of both producing properties and non-producing leaseholds that relate to defined drillable prospects.

Within the enclosed loose leaf volume is (1) a listing of the 79 currently producing wells showing the average monthly production for the first half of 1986 (2) * * * [Excerpts] from the L.A. Martin and Associates, Inc., "Reserves Estimate and Economic Analysis" report dated February 17, 1986. Martin's production history curves have been updated through June 1986. Also included with the Martin data are monthly production statistics for each of the 79 wells from inception to the most recent information available. (3) Description and location for all of Tri-Power's leasehold interest both developed and undeveloped, and; (4) The final section deals with the four major leased, undrilled prospects in which Tri-Power has an interest and a listing of unleased, geologically-geophysically defined prospects.

* * * * * * *

[Tri-Power] will sell all of its U.S. producing properties for $10,500,000.00 with a minimum of $500,000.00 to be paid in cash with assumption by Buyer of * * * [Tri-Power's] $10,000,000.00 U.S. bank debt, but reserving to * * * [TPC] a 20% net profit interest in the properties on a project basis. This would result in * * * [TPC] backing in for a 20% net profit interest after Buyer recovers all of his costs out of production from the sold properties.

Previously, on August 18, 1986, TPC had made a similar offer to United Oil and Minerals. In both instances, TPC offered to sell only the stock of Tri-Power, not its individual assets.

Shortly after TPC's offer to petitioner, on October 10, 1986, Bonanza merged into Tri-Power.

B.   Petitioner's Examination of Tri-Power's Properties

Upon receiving the offer from TPC, petitioner's acquisition team began investigating the Tri-Power properties. Petitioner's acquisition team studied not only the 1986 LAM reserve report,

effective as of January 1, 1986, but also the other information provided in conjunction with TPC's offer.

Sometime during October 1986, petitioner engaged LAM, Tri-Power's independent reserve engineer since at least 1985,[19] to update the 1986 LAM reserve report. Petitioner requested LAM to roll forward its earlier projections to November 1, 1986, using petitioner's oil and gas price forecast. The Society of Petroleum Evaluation Engineers (SPEE) conducts an annual survey of oil and gas price forecasts by producers, consultants, and bankers. The SPEE survey published during July 1986 (1986 SPEE survey) provides an accurate compilation of the responses to that survey. The oil and gas price forecast provided by petitioner to LAM for use in the rollforward was higher than the mean reported by the 1986 SPEE survey (1986 SPEE mean), but within one standard deviation of the 1986 SPEE mean.

Tri-Power provided its updated 1986 production data to both petitioner and LAM. Accordingly, LAM had available its production curves, updated through June 1986, and the production data necessary to plot production curves through October 1986. LAM's updated reserve report (the 1986 LAM updated reserve report), however, did not incorporate any of the updated

---

[19] The record indicates that LAM began work for Tri-Power's predecessor during 1982. Aside from a reserve report dated Jan. 22, 1985, however, the record contains no evidence that LAM was involved with the Tri-Power properties prior to 1985.

production data from 1986. During 1986, some of the wells valued in the 1986 LAM reserve report experienced improved performance, and some experienced deteriorated performance.

The 1986 LAM updated reserve report, dated October 14, 1986, estimated the discounted future net revenue from Tri-Power's proved and producing reserves to be $19,114,541 as of November 1, 1986, using a 10-percent discount rate. In a schedule to the 1986 LAM updated reserve report, LAM also presented a range of present worth estimates using different discount rates. LAM estimated the present net worth of Tri-Power's proved and producing reserves to be $14,447,362, using a 20-percent before-tax discount rate. The 1986 LAM updated reserve report indicated that the estimated future net revenues presented therein were not to be construed as LAM's opinion of the fair market value of the properties included in the report. Instead, the report presented LAM's opinion of the future net revenue that would be derived from the recovery of the estimated reserves under the assumed timing and economic conditions.

The 1986 LAM updated reserve report estimated Tri-Power's proved and producing reserves, as of November 1, 1986, to be as follows:

|  | Oil<br>MBBL[1] | Gas<br>MMCF[2] |
|---|---|---|
| Gross reserves | 2264.159 | 51521.452 |
| Net reserves | 404.925 | 10136.649 |

[1] MBBL is the abbreviation for 1,000 barrels of crude oil or liquid petroleum products.
[2] MMCF is the abbreviation for 1 million cf of gas.

At the standard conversion ratio of 6,000 cf of gas to 1 barrel of oil, these reserves translate into 2.1 million BOE (rounded).[20] The 1986 LAM updated reserve report indicated that several of the wells evaluated in the report had a "relatively short or no production history and therefore production extrapolations are subject to a higher degree of inaccuracy."

LAM made available to petitioner, for inspection and review, the data underlying both the 1986 LAM reserve report and the 1986 LAM updated reserve report. Much of the data underlying LAM's 1986 reserve reports is no longer available.

As part of petitioner's investigation into Tri-Power, Messrs. Billings and Wagner traveled to Houston on at least two occasions to interview Tri-Power's personnel and evaluate the

---

[20] The barrel of oil equivalent (BOE), on the basis of the reserves reflected in the 1986 LAM updated reserve report, is computed as follows:

| Oil BBL | | 404,925.0 |
|---|---|---|
| Gas BOE | | |
| $\dfrac{10,136,649,000\ cf}{6000\ cf}$ | = | 1,689,441.5 |
| Total BOE | | 2,094,366.5 |

Tri-Power properties. During these visits, Mr. Billings and Mr. Cassell reviewed, in detail, the geological and seismic data relating to the Tri-Power reserves and the 1986 LAM reserve report. Mr. Cassell was candid with Mr. Billings and Mr. Wagner, disclosing Tri-Power's strengths as well as its weaknesses. In addition, Mr. Billings visited the LAM offices, where he reviewed the Tri-Power properties with Mr. Martin.

Petitioner's policy was to use its in-house personnel to evaluate prospective properties, and during its investigation of the Tri-Power properties, petitioner's acquisition team consulted petitioner's in-house petroleum engineers and geologists. In-house personnel also conducted title and lease reviews. Messrs. Wagner and Miller reviewed Tri-Power's contracts for the purchase and sale of its oil and natural gas production. Mr. Wagner also took the lead investigating those Tri-Power properties with which he had prior experience, including the Meeteetse field located in Wyoming's Big Horn Basin. In connection with that investigation, Mr. Wagner reviewed Tri-Power's land files and met with Tri-Power's landman, Paul Vandergriff.

In addition to its in-house review, petitioner engaged Gerald Swonke, an oil and gas attorney from Houston, Texas, to review Tri-Power's major producing properties. Mr. Swonke's investigation included, inter alia, a review of Tri-Power's

leases and an examination to confirm that Tri-Power held good title to its properties.

Petitioner concluded from its investigation of the Tri-Power properties that the 1986 LAM reserve report undervalued certain properties and overvalued others. In particular, petitioner's acquisition team believed that the 1986 LAM reserve report underestimated Tri-Power's reserves located in the Meeteetse and Hough fields and that it overestimated the value of Tri-Power's reserves located in a Texas field known as South Atlanta. With respect to the Meeteetse field, Mr. Wagner discovered at least two promising wells that had been excluded from the 1986 LAM reserve report. Discussions with Mr. Cassell also revealed that a well owned and operated by Tri-Power in the Hough field, located in Mississippi, was producing at a rate 10 times greater than had previously been projected for that well. Mr. Billings discovered, also through discussions with Mr. Cassell, that the Tri-Power properties located in the South Atlanta field were troubled. South Atlanta produced "sour gas",[21] and one of Tri-Power's two South Atlanta wells suffered from mechanical problems that severely limited its production. On the whole, however, petitioner's management found the 1986 LAM reserve report to be a reliable estimate of Tri-Power's reserves.

---

[21]    "Sour gas" contains large amounts of hydrogen sulfide.

C.    Petitioner's Examination of Tri-Power's NOL's and
Financial Condition

Petitioner first became aware of Tri-Power's NOL's when it received the sales package from Ms. Dichter. Sometime during early October 1986, petitioner engaged Arthur Andersen to review Tri-Power's tax returns and to verify Tri-Power's NOL's.

In a letter dated October 22, 1986, Arthur Andersen communicated to petitioner the results of its investigation up to that point. In that letter, Arthur Andersen indicated that it had reviewed (1) the tax returns and related workpapers of Tri-Power and its predecessors for the years 1976 through 1985, representing $65.9 million of the total NOL's of $84 million, (2) tax returns representing 94 percent of the total loss carryforward, and (3) the various acquisitions and reorganizations that resulted in the formation of Tri-Power. Arthur Andersen opined that the Federal income tax returns it reviewed were prepared in accordance with Federal tax law. In reviewing the tax returns of Tri-Power and its predecessors, Arthur Andersen identified several issues that it believed needed to be addressed before the acquisition became final. Arthur Andersen, in the October 22, 1986, letter, recommended that petitioner obtain, before closing on the acquisition of Tri-Power, tax opinions concerning (1) the tax consequences of the various acquisitions and reorganizations of Tri-Power's

predecessors, (2) the application of sections 382 and 269 to petitioner's acquisition of Tri-Power, and (3) the tax consequences of Tri-Power's recapitalization.

By letter dated November 17, 1986, Arthur Andersen issued its opinion concerning the issues earlier identified for resolution in the October 22, 1986, letter. In rendering its opinion, Arthur Andersen obtained the opinion of Chamberlain, Hrdlicka, White, Johnson & Williams (Chamberlain), Tri-Power's counsel, on certain issues. On the basis of its review of Chamberlain's opinion and petitioner's representations,[22] Arthur Andersen issued a favorable opinion relating to the acquisition of Tri-Power, its prior activities, and the future use of its NOL's.[23]

During the weeks leading up to the acquisition, petitioner's management had regular discussions with Arthur Andersen concerning its investigation of Tri-Power and its NOL's. Finally, sometime prior to the November 1986 acquisition of Tri-

---

[22] Petitioner represented to Arthur Andersen that its principal purposes for acquiring Tri-Power were to diversify geographically its oil and gas operations, enter a new market area, create a holding company structure, and acquire oil and gas reserves and leases at an attractive price.

[23] Accompanying that opinion was a copy of the Chamberlain opinion, concerning the tax consequences of various acquisitions and reorganizations of Tri-Power's predecessors, reviewed by Arthur Andersen; and three internal memoranda concerning the remaining issues addressed by Arthur Andersen.

Power, Arthur Andersen made a presentation to petitioner's management concerning the potential use of Tri-Power's NOL carryforwards. The potential use of Tri-Power's NOL carryforwards was also discussed, on at least one occasion, by petitioner's board. Petitioner's management was aware that unless the acquisition was made before the end of 1986, pending legislation, amending section 382, would limit petitioner's ability to use the NOL's of an acquired corporation.

Sometime during October 1986, Messrs. Billings and Reed traveled to Canada to meet with TPC's representatives. During that trip, Wes Ismond, TPC's vice president of finance, revealed that Tri-Power owed $10 million to the banks, and that the banks were putting pressure on Tri-Power. On the return trip, Mr. Reed discovered, while reviewing Tri-Power's balance sheet, the $46.5 million intercompany debt that Tri-Power owed to TPC. Uncomfortable acquiring Tri-Power with its debt position, Mr. Reed consulted with Arthur Andersen, which later recommended a put option.

Subsequently, on November 18, 1986, Tri-Power underwent a recapitalization, discussed supra, pursuant to which Tri-Power's debts to the banks and to TPC were eliminated in exchange for the issuance of Tri-Power preferred stock. The next day, as discussed infra, petitioner, TPC, Tri-Power, Bonanza, and the banks entered into a "Stock Purchase and Put Option Agreement",

pursuant to which petitioner purchased all of the common and preferred stock of Tri-Power from TPC and the banks.

    D.    The Acquisition

    At a special meeting of the board, held on October 16, 1986, petitioner's management presented the Tri-Power acquisition for consideration by the board.  Management explained that while its investigation into Tri-Power was ongoing, on the basis of the information then developed, management recommended that the board authorize the acquisition of Tri-Power because the acquisition satisfied all of petitioner's acquisition limitations. Specifically, Tri-Power possessed oil and gas reserves located primarily in Texas and Wyoming.  Accordingly, the acquisition of Tri-Power presented petitioner with the opportunity to expand outside the Hugoton field and establish a Gulf Coast presence. Further, the acquisition of Tri-Power presented petitioner with the opportunity to expand its product base with oil reserves, as well as to make contacts with new markets for natural gas production.  Finally, TPC's asking price, $10.5 million, fit petitioner's budget and size limitations.  Management also explained that the proposed acquisition would be a purchase of all the outstanding capital stock of Tri-Power, and that if successful, petitioner would maintain the Tri-Power corporate entity as its wholly owned subsidiary.  After an extended discussion, petitioner's board resolved:

if further investigation and analysis verifies * * * [that] the data and projections respecting Tri-Power meet those expectations outlined to the Directors in this meeting, the officers of the Company are authorized to make a bid not to exceed ten and one half million dollars ($10,500,000) for all the capital stock of * * * [Tri-Power].

Petitioner's board rejected TPC's proposed retention of a 20-percent net profits interest.

On October 22, 1986, 8 days after the issuance of the 1986 LAM updated reserve report, petitioner issued a letter of intent to enter into a definitive agreement to purchase 100 percent of the stock of Tri-Power for $9.75 million. Petitioner conditioned the acquisition on, inter alia, the receipt of a favorable opinion from its tax adviser. The letter of intent states as follows:

Plains will not consummate the transaction contemplated hereby until it receives an opinion letter from its tax advisor * * * stating the Plains' tax advisor has reviewed all tax information relevant to the business of Tri-Power and Tri-Power's predecessors, that the tax returns and data supporting those returns are accurate, complete and verifiable as such and that in such advisor's opinion Plains' acquisition of Tri-Power as provided for in the definitive Agreement should achieve the tax consequences intended by the parties thereto.

Petitioner further conditioned the acquisition on the receipt of an opinion from Tri-Power's tax counsel, in a form satisfactory to petitioner, that (1) Tri-Power and its predecessors had filed timely all tax returns required by Federal, State, county and local taxing authorities, (2) the information contained in those

returns was complete and accurate in all respects, and (3) that Tri-Power had paid all the taxes it was obligated to pay. The letter of intent contained no provision conditioning the acquisition on the receipt of a favorable opinion concerning Tri-Power's reserves. The letter of intent, however, did require Tri-Power to represent that it had no information or reason to dispute, in the aggregate, the accuracy of LAM's reserve estimates. In a letter dated October 27, 1986, Tri-Power refused to make the requested representation, stating that "we have provided engineering reports to you for your information, however, you must satisfy yourself as to their adequacy for your purposes."

At its regular quarterly meeting on November 6, 1986, petitioner's board authorized the acquisition of Tri-Power. Petitioner's board also authorized the transfer of petitioner's existing oil and gas properties to Tri-Power.

On November 14, 1986, petitioner issued a second letter of intent to acquire the stock of Tri-Power. The second letter of intent also conditioned the acquisition on petitioner's receipt of an opinion from its tax advisers.

On November 17, 1986, Arthur Andersen issued a favorable tax opinion, discussed supra, relating to the acquisition of Tri-Power, its prior activities, and the future use of its NOL's.

On November 19, 1986, petitioner, TPC, Tri-Power, Bonanza,[24] and the banks entered into a "Stock Purchase and Put Option Agreement". Petitioner granted each of the banks a put option pursuant to which each bank could, at its option, sell to petitioner 46,250 shares of Tri-Power preferred stock at a price of $100 per share.[25] Pursuant to the stock purchase agreement, petitioner purchased all of the capital stock of Tri-Power by paying (1) $549,089[26] to TPC and (2) $9.25 million ($4.625 million each) to the two banks. The parties to the stock purchase agreement closed the transaction on November 21, 1986, and, on that date, petitioner and Tri-Power became members of an affiliated group.

The total proved, developed, and producing reserves that petitioner acquired from Tri-Power were less than the net reserves of several single wells that petitioner already owned. Nonetheless, the acquisition of Tri-Power replaced approximately 50 percent of petitioner's 1986 production. Through the

---

[24] As discussed supra, Bonanza was merged into Tri-Power on Oct. 10, 1986. Accordingly, it is unclear why Bonanza was a separate party to this agreement.

[25] Pursuant to the agreement, each put option was to terminate if not validly exercised on or before Nov. 24, 1986.

[26] The parties stipulated that petitioner paid TPC $500,000 plus the amount of Tri-Power's adjusted net working capital of $235,367 less a postclosing adjustment of $186,279, for a total of $549,089.

acquisition of Tri-Power, petitioner also acquired interests in nonproducing prospective leaseholds, undeveloped acreage, and Tri-Power's records concerning the acquired properties.

E.    Public Announcements Concerning the Acquisition

In a letter to the shareholders dated November 15, 1986, Mr. Jackson announced that petitioner had signed a letter of intent to acquire the stock of Tri-Power.  In that letter, Mr. Jackson reported that Tri-Power owned proved and producing reserves, estimated by independent engineers to be 10.1 billion cf of gas and 404,925 barrels of oil.  In addition, Mr. Jackson indicated that Tri-Power had certain tax loss carryforwards available from prior operations.  Petitioner again announced the pending acquisition in a press release issued on November 18, 1986. Finally, petitioner reported the acquisition agreement in its September 30, 1986, Form 10-Q filed with the Securities and Exchange Commission during November 1986.  The press release and Form 10-Q each contained substantially the same information as Mr. Jackson's November 15, 1986, letter to the shareholders.

Petitioner's 1986 annual report announced the completed acquisition of Tri-Power for $9.75 million, the estimated quantity of reserves acquired, and the fact that Tri-Power had certain loss carryforwards available from prior operations. Among the favorable developments for 1986, the 1986 annual report recited petitioner's expectation of "lower income taxes for the

future".  The notes to the financial statements explained that, as a result of the acquisition of Tri-Power, petitioner gained access to "substantial tax loss carryforwards which are available to reduce future income taxes."  The 1986 annual report also reiterated petitioner's continued commitment to its acquisition program.

III.  Petitioner's Operations After the Acquisition

    A.  Transfer of Petitioner's Oil and Gas Properties to Tri-Power

On December 1, 1986, Tri-Power's name was changed to Plains Petroleum Operating Co. (to avoid confusion, however, we will continue to refer to Plains Petroleum Operating Co. as Tri-Power).  Also on December 1, 1986, petitioner transferred all of its oil and gas properties to Tri-Power (the December 1, 1986, property transfer will sometimes be referred to as the dropdown and the properties transferred will be referred to as the dropdown properties).[27]  Petitioner intended to maintain Tri-Power as a wholly owned subsidiary, and the dropdown was an integral part of petitioner's plan to acquire Tri-Power.

For each of the years 1987 through 1996, the Tri-Power properties produced oil and gas amounting to approximately 5 percent of the production from the dropdown properties during

---

[27]  Petitioner used only one operating subsidiary, Tri-Power, until 1992, when it organized Plains Petroleum Gathering Co.

that same period.  The Tri-Power properties generated a total net cash-flow in the amount of $6,819,185 during the period 1987 through 1997.

B.    Pursuit of the Tri-Power Properties

After the acquisition, petitioner continued to market production from its preacquisition properties primarily to KN Energy.  As management continued to evaluate the Tri-Power properties, petitioner divested itself of certain properties and pursued others.

Upon acquisition of Tri-Power, petitioner inventoried the acquired properties and identified certain properties for disposal.  On the basis of past experience, petitioner's management was not interested in retaining the Tri-Power properties located in California, Kentucky, and Pennsylvania. Additionally, petitioner decided not to pursue development of certain Tri-Power properties located in the Northern Rocky Mountains, an area with geologic faults that is difficult to explore.

Petitioner pursued development of the Tri-Power properties located in the Meeteetse field.  Petitioner sought and acquired the right to operate the Meeteetse wells, giving it the power to control both the costs and the timing of work done on the property.  Additionally, petitioner successfully pursued and acquired additional working interests in the Meeteetse field.

The Meeteetse wells were experiencing problems: they were not flowing regularly, and there were problems transporting the production from the field to the market. Accordingly, petitioner took steps to improve its production in the Meeteetse field by increasing the field compression to allow the gathering system to take more gas through the transmission line that took it to market. Petitioner made arrangements with the owner of the gathering facility and a nearby market to sell its Meeteetse production directly to that market. Petitioner also renegotiated a new contract with Tennessee Gas Pipeline (a division of Tenneco, Inc.) relating to the Meeteetse properties. Finally, during 1995, petitioner drilled a new well in the Meeteetse field.

Petitioner retained the Tri-Power properties located in the Powder River Basin and acquired additional reserves in that region. In addition petitioner acquired McAdams Roux, a high-tech company, to assist in its exploration and development efforts in that region. Petitioner also drilled a second well on the Schoenfeld property, a Tri-Power property located in the Deckers Prairie field. Finally, petitioner made efforts to improve production in the troubled South Atlanta field. Petitioner believed it could better produce and market the South Atlanta production and attempted to takeover as the operator of the South Atlanta wells. An audit ordered and paid for by

petitioner and the other working interest owners revealed that the incumbent South Atlanta operator, Strago, had an undisclosed interest in the "sweetening" plant that removed the sulfur from the gas. Petitioner looked for alternative sweetening plants and unsuccessfully tried to take over as the operator. Petitioner ultimately sold its interests in the South Atlanta field during 1992.

Through the years petitioner divested other properties as well. By the end of 1995, petitioner sold or abandoned many of the wells acquired in the Tri-Power acquisition.

C.  Continued Acquisition Efforts

During the years subsequent to the Tri-Power acquisition, petitioner continued its acquisition program. During the period from 1988 to 1994, petitioner added and replaced reserves through the acquisition of over 17 oil and gas companies.[28]

---

[28]  Petitioner's acquisitions included the following:

| Year Acquired | Name | Location | Reserves Acquired | Acquisition Price |
|---|---|---|---|---|
| 1988 | Alpar Oil | Texas Panhandle | Oil & Gas | $6,000,000 |
| | Midlands Resources | West Texas | Oil & Gas | 15,700,000 |
| | Miscellaneous | Meeteetse/Wyoming | Gas | 694,118 |
| | Wedge Oil & Gas | West Texas | Oil & Gas | 2,500,000 |

(continued...)

D.   Petitioner's Use of the Tri-Power NOL's

Following the December 1, 1986, dropdown, petitioners applied Tri-Power's NOL's against the income of the dropdown properties.  For the years 1986 through 1990, petitioners reported taxable income, before taking into consideration any NOL deductions, and NOL deductions as follows:

| Year | Taxable Income | NOL Deductions |
|------|----------------|----------------|
| 1986 | $2,015,639 | $457,733 |
| 1987 | 4,144,056 | 4,144,056 |
| 1988 | 8,399,084 | 8,399,084 |
| 1989 | 10,770,299 | 10,770,299 |
| 1990 | 12,640,852 | 12,640,852 |

During the years in issue, petitioners deducted over $18 million of the Tri-Power NOL's.  Petitioner, as a result of the NOL

---

[28](...continued)

| Year Acquired | Name | Location | Reserves Acquired | Acquisition Price |
|---------------|------|----------|-------------------|-------------------|
| 1990 | Devon Oil | Meeteetse/Wyoming | Unknown | 436,417 |
| | McAdams, Roux & Associates | Wyoming | Oil & Gas | 7,100,000 |
| | Morgan Energy Partners | West Texas | Gas | 2,500,000 |
| | Murphy Oil | New Mexico | Oil | 2,250,000 |
| | Permian Minerals/ Michael Cass | West Texas | Oil & Gas | 9,200,000 |
| 1991 | Arch Petroleum | West Texas | Gas | $17,300,000 |
| | Michael Cass | West Texas | Oil | 1,500,000 |
| 1992 | ARCO | Wyoming | Gas | 10,000,000 |
| | Phillips Petroleum | Wyoming | Unknown | 635,000 |
| 1993 | Miscellaneous | Various locations | Oil & Gas | 1,600,000 |
| 1994 | Anadarko Petroleum | Utah, Wyoming | Oil & Gas | 24,300,000 |
| | Ensign Oil & Gas | Wyoming | Gas | 1,850,000 |
| | Raydon Exploration | Oklahoma | Gas | 1,825,000 |
| | | | | 105,390,535 |

carryforwards in issue, paid no regular Federal income tax during the period 1987 to 1993.

Respondent disallowed petitioner's deductions for the Tri-Power NOL carryforwards on the ground that the principal purpose for petitioner's acquisition of Tri-Power and subsequent dropdown of its oil and gas producing properties to Tri-Power was the evasion or avoidance of Federal income tax.

IV. <u>Petitioners' Return Preparation and Tax Advice From Arthur Andersen</u>

From petitioners' inception through the years in issue, Arthur Andersen audited petitioners, certified their financial statements, and prepared their Federal corporate income tax returns. Petitioners selected Arthur Andersen because it performed similar services for petitioner's former parent, KN Energy, and because it represents more independent oil and gas companies than any other accounting firm. During 1991, 1992, and 1993, petitioners' lacked the available accounting staff needed to assist in the preparation of their Federal corporate income tax returns because of commitments created by several acquisitions. Accordingly, petitioners engaged a certified public accountant (C.P.A.) in Denver, Colorado, to assist petitioners' controller in preparing certain schedules and workpapers for review by Arthur Andersen. Petitioners provided those schedules and workpapers to Arthur Andersen for use in

preparing their Federal corporate income tax returns.  Arthur
Andersen had access to all of petitioners' books and records.

Petitioner also relied on Arthur Andersen for tax advice in
connection with the acquisition of Tri-Power, including the
proper treatment of the NOL's in issue in the instant case.  As
discussed supra, Arthur Andersen conducted an extensive
investigation into the tax issues surrounding the acquisition,
and based, in part, on petitioner's representations[29] issued an
opinion concerning the proper tax treatment.

OPINION

I.  Principal Purpose for the Acquisition and Dropdown

The first issue we must decide is whether petitioner is
entitled to carry over and deduct the NOL's incurred by Tri-Power
before the acquisition and dropdown.  Respondent contends that
petitioner is not entitled to the benefit of the NOL deductions
because petitioner's principal purpose for the acquisition and
subsequent dropdown was the evasion or avoidance of Federal
income tax.  Petitioner contends that the acquisition and
subsequent dropdown were not occasioned primarily by the desire
to obtain tax losses but, instead, by business considerations.

Section 269(a) provides that if a corporation (or, in
certain situations, its property) is acquired for the principal

---

[29]    See supra note 22.

purpose of evading or avoiding Federal income tax by securing the benefit of deductions, credits, or other allowances that the acquiring person or corporation would not otherwise enjoy, the Secretary may disallow such deductions, credits or other allowances.[30]  Accordingly, section 269(a) is not applicable[31]

---

[30]    Sec. 269(a) provides, in part, as follows:

   SEC. 269(a).  In General.--If--

      (1)  any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

      (2)  any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

   and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance.  * * *

[31]    The instant controversy has its origin in petitioner's acquisition of Tri-Power and the subsequent dropdown.  The parties dispute whether sec. 269(a)(2) can separately apply to the dropdown.  We conclude that it is unnecessary to address the dropdown dispute because, as discussed supra in our findings of fact, we found that the dropdown was an integral part of petitioner's plan to acquire Tri-Power.  Accordingly, we shall look to the purposes of the overall plan of acquisition to decide whether the principal purpose for the acquisition and dropdown was tax avoidance.  See, e.g., Key Buick Co. v. Commissioner, T.C. Memo. 1976-303 (where the issue of whether the transactions

(continued...)

unless the tax evasion or avoidance motive is the principal purpose for the acquisition.  See sec. 269(a).  In the context of section 269, "principal purpose" means that the evasion or avoidance purpose must outrank, or exceed in importance, any other purpose.  See Capri, Inc. v. Commissioner, 65 T.C. 162, 178 (1975); D'Arcy-MacManus & Masius, Inc. v. Commissioner, 63 T.C. 440, 449 (1975); S. Rept. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 1017.  Petitioners bear the burden of proof.[32]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  To prevail, petitioners need prove only that the avoidance of tax was not the principal purpose.  See Capri, Inc. v. Commissioner, supra at 178.

The resolution of the dispute concerning the purpose of the acquisition presents a question of fact which must be resolved by considering all of the facts and circumstances of the entire transaction.  See Capri, Inc. v. Commissioner, supra at 178;

---

[31](...continued)
were an integral plan and the determination of whether the principal purpose of the transactions was tax avoidance were inseparable).

[32]    Internal Revenue Service Restructuring & Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3001, 112 Stat. 685, 726-727, added sec. 7491, which shifts the burden of proof to the Secretary in certain circumstances.  Sec. 7491 is applicable to "court proceedings arising in connection with examinations commencing after the date of the enactment of this Act."  RRA sec. 3001(c). RRA was enacted on July 22, 1998.  Accordingly, sec. 7491 is inapplicable to the instant case.

D'Arcy-MacManus & Masius, Inc. v. Commissioner, supra at 449;
sec. 1.269-3(a), Income Tax Regs.  We must look to the intent or
purpose of the acquiring person or corporation at the time of the
acquisition.  See Southern Dredging Corp. v. Commissioner, 54
T.C. 705, 718 (1970).  As the acquisition and dropdown were
integral steps in petitioner's plan to acquire Tri-Power, we
shall consider the overall plan of acquisition to determine
whether tax avoidance was the primary purpose.

Business Considerations

Petitioner contends that it acquired Tri-Power principally
to replace its reserves and diversify its operations; that it
transferred its oil and gas properties to Tri-Power principally
to aid its business operations and acquisition efforts; and that
the acquisition of Tri-Power and subsequent transfer of its oil
and gas properties to Tri-Power were motivated principally by
business considerations.

Respondent does not challenge petitioner's need for
diversification but contends that petitioner greatly exaggerates
the need for replacement reserves during 1986.  Respondent points
out that during 1986 petitioner's gas reserves were projected to
last for approximately 25 years and that, as a result of the KCC
infill drilling order, petitioner expected to increase its proven
natural gas reserves by approximately 31 percent.  Accordingly,
respondent contends that petitioner had no immediate need for

replacement reserves. Additionally, respondent contends that the acquisition of Tri-Power did not significantly add to petitioner's reserve base because the total reserves acquired amounted to less than the reserves of several single wells already owned by petitioner.

We disagree with respondent's contentions. Notwithstanding its existing supply of gas reserves at the time of the acquisition of Tri-Power, petitioner needed to continue the growth of its reserve base. Several witnesses testified that reserve growth is necessary for survival in the oil and gas business: oil and gas companies must replace diminishing reserves; otherwise they simply produce themselves out of business. Additionally, although the KCC infill drilling order allowed petitioner to increase its gas reserves, it did nothing to diversify petitioner's production mix. Petitioner still needed oil reserves. Finally, although Tri-Power's reserves were small in comparison to petitioner's existing reserves, the acquisition was wholly consistent with petitioner's initial strategy to make smaller acquisitions. Furthermore, the acquisition of Tri-Power replaced over half of petitioner's 1986 production.

Respondent also contends that the dropdown served no real business purpose except to enable petitioner to use Tri-Power's NOL's. We disagree. Petitioner transferred its oil and gas

properties to Tri-Power pursuant to a preexisting plan to adopt a holding company structure, a structure commonly used in the oil and gas business. Long before it knew about Tri-Power or its NOL's, petitioner decided to adopt a holding company structure to aid its business operations and acquisition efforts. Petitioner long held the belief that an operating subsidiary would provide it with greater flexibility to make acquisitions and protection against hostile takeover attempts. Accordingly, petitioner's plan to adopt a holding company structure was, from the beginning, an integral part of its reserve acquisition and hostile takeover defense strategy. On the basis of the extensive evidence in the record in the instant case, we conclude that the dropdown served valid business purposes aside from facilitating petitioner's use of Tri-Power's NOL's.

### Tax Considerations

Petitioners have demonstrated legitimate business purposes for petitioner's acquisition of Tri-Power and the subsequent transfer of petitioner's oil and gas properties to Tri-Power. Respondent contends, however, that the circumstances surrounding the acquisition and dropdown demonstrate that tax considerations, not business considerations, were petitioner's primary motive. Respondent contends that petitioner was a profitable oil and gas company that set out to acquire a loss corporation to provide NOL's to offset its income. Respondent points to several facts.

During 1986, petitioner expected increased future revenues as a result of the KCC infill drilling order and FERC Order 451. Petitioner knew, at the time of the acquisition, that Tri-Power had NOL's in excess of $84 million, and that amendments to section 382, which were to become effective by the end of 1986, would limit its ability to use Tri-Power's NOL's. Petitioner commissioned an extensive investigation of Tri-Power's NOL's. During the weeks leading up to the acquisition, petitioner's management had regular discussions with Arthur Andersen concerning its investigation of Tri-Power and its NOL's. Arthur Andersen made a presentation to petitioner's management concerning the potential use of Tri-Power's NOL's, and the NOL's were discussed with petitioner's Board. Then, within days of the acquisition, and before the end of 1986, petitioner transferred its profitable oil and gas properties to Tri-Power, enabling it to use Tri-Power's NOL's.

Petitioner admits and we agree that tax considerations played a role in the acquisition and dropdown. The question, however, is not whether tax considerations were present, but whether those considerations were the principal purpose for the acquisition of Tri-Power and the subsequent dropdown.

Primary Purpose for the Acquisition and Dropdown

After careful consideration of all of the facts and circumstances surrounding the transactions in issue, we conclude

that the business considerations were the principal purpose for the acquisition and dropdown.  Several factors support our conclusion.

Initially, we give great weight to the fact that petitioner purchased Tri-Power pursuant to a preexisting plan to replace its reserves and diversify its operations through acquisition. Petitioner's acquisition policy, established shortly after its spinoff from KN Energy, is corroborated by contemporaneous public announcements.  Beginning with its first shareholder report, the 1985 third quarter report, and continuing with every report thereafter, petitioner publicly and repeatedly committed itself to a program of reserve replacement and diversification through acquisition.  Accordingly, petitioner established its acquisition policy long before it ever knew about Tri-Power or its NOL's. Petitioner's formally documented policy of expansion and diversification through acquisition rather than through internal growth tends to establish a non-tax-avoidance motive.  See, e.g., U.S. Shelter Corp. v. United States, 13 Cl. Ct. 606, 624 (1987).

We also consider petitioner's actions leading up to and following the acquisition and dropdown.  See D'Arcy-MacManus & Masius, Inc. v. Commissioner, 63 T.C. at 451.  After forming an in-house acquisition screening team, petitioner's management adopted specific acquisition limitations.  Petitioner sought targets with significant oil and gas reserves.  Petitioner

further sought geographic and geologic diversification. In particular, petitioner desired to expand outside of the Hugoton field into the Gulf Coast region and to broaden its production mix by acquiring more oil reserves. Additionally, petitioner sought targets in the $10 to $25 million range. During 1986, petitioner considered numerous acquisition opportunities. However, petitioner, prior to the Tri-Power acquisition, was wholly unsuccessful in its acquisition efforts. Petitioner decided to acquire Tri-Power because, after a thorough investigation, petitioner determined that Tri-Power satisfied all of its acquisition limitations. Following the Tri-Power acquisition, petitioner actively pursued further development of the Tri-Power properties. Petitioner also continued vigorously to pursue its acquisition policy. During the years following the Tri-Power acquisition, petitioner continued to build its reserve base with the acquisition of over 17 oil and gas companies. On the basis of the record in the instant case, we conclude that petitioner's actions both before and after the acquisition of Tri-Power are wholly consistent with its stated reserve acquisition policy. Additionally, we note that NOL's were not among petitioner's predefined acquisition limitations, which supports the conclusion that petitioner did not set out to acquire a loss company.

Another important factor is the testimony of the acquiring corporation's top management. See Capri, Inc. v. Commissioner, 65 T.C. at 179; D'Arcy-MacManus & Masius, Inc. v. Commissioner, supra at 450. Mr. Jackson, petitioner's CEO, Mr. Billings, petitioner's COO, and Mr. Reed, petitioner's vice president of finance, all testified that petitioner paid nothing for Tri-Power's NOL's. Mr. Jackson and Mr. Wagner, petitioner's land manager, also testified that they supported the acquisition of Tri-Power because it satisfied all of petitioner's predefined acquisition limitations. Additionally, Harry S. Welch, a member of petitioner's board, testified that the board was primarily concerned with the acquisition of reserves and that the NOL's were presented as a matter of secondary importance. The foregoing individuals were intimately involved in the decision to acquire Tri-Power. Their testimony was credible. In conjunction with other corroborating evidence contained in the record, their testimony is an important factor supporting our conclusion that business considerations were the principal purpose for the acquisition of Tri-Power.

The dropdown, which, as we have found supra, was an integral part of petitioner's plan to acquire Tri-Power, facilitated petitioner's preexisting plan to adopt a holding company structure. We recognize, as respondent so vigorously argues, that the dropdown also enabled petitioner to use the Tri-Power

NOL's. It is well settled, however, that taxpayers are free to arrange their business affairs so to as to minimize tax. See Gregory v. Helvering, 293 U.S. 465 (1935); Ach v. Commissioner, 358 F.2d 342 (6th Cir. 1966), affg. 42 T.C. 114 (1964); Briarcliff Candy Corp. v. Commissioner, T.C. Memo. 1987-487. Accordingly, we do not believe that the dropdown, by itself, evinces a principal purpose to evade or avoid Federal income tax. Moreover, we do not believe that the dropdown taints the overall plan of acquisition.

All of the factors discussed above are inconsistent with respondent's contention that the acquisition and dropdown were undertaken for the principal purpose of acquiring tax losses. To the contrary, both transactions were undertaken pursuant to petitioner's preexisting plans to acquire replacement reserves, diversify, and adopt a holding company structure. Accordingly, we conclude that, while tax factors were taken into consideration, tax avoidance was not the principal purpose for the acquisition and dropdown.

### Respondent's Arguments

Although we are not persuaded that tax avoidance was the primary motivation for the acquisition and dropdown, we shall briefly discuss some of respondent's arguments to the contrary.

<u>Awareness, Investigation, and Discussion of Tri-Power's NOL's</u>

Respondent first argues that petitioner's awareness, investigation, and discussion of Tri-Power's NOL's supports a finding that section 269 applies. It is uncontroverted that (1) petitioner knew that Tri-Power had NOL's in excess of $84 million, (2) petitioner engaged Arthur Andersen to conduct an extensive investigation of Tri-Power's prior tax returns, its NOL's, and their potential use by petitioner, and (3) petitioner's management and board discussed Tri-Power's NOL's. "It is clear, however, that consideration of the tax aspects of a transaction does not mandatorily require application of section 269 and that such consideration is only prudent business planning." <u>D'Arcy-MacManus & Masius, Inc. v. Commissioner</u>, 63 T.C. at 451; see also <u>Brumley-Donaldson Co. v. Commissioner</u>, 443 F.2d 501, 510 (9th Cir. 1971) (Trask, J., dissenting) ("In the complexity of today's business and tax jungle a corporate president who does not obtain tax advice before an acquisition, or merger or substantial dollar transaction ought to be fired."), affg. T.C. Memo. 1969-183; <u>VGS Corp. v. Commissioner</u>, 68 T.C. 563, 596 (1977) ("Complicated business transactions do not take place in a vacuum and we find this to be nothing more than prudent business planning."). We believe that petitioner's consideration of Tri-Power's prior Federal income tax returns and

its NOL's was prudent business planning.  Accordingly, we do not agree that petitioner's knowledge, investigation, or discussion of Tri-Power's NOL's leads to the conclusion that petitioner had a tax avoidance purpose.

### Investigation of Tri-Power's Reserves

Respondent next argues that petitioner's investigation of Tri-Power's reserves was minimal in comparison to its investigation of Tri-Power's NOL's.  To the contrary, we think that petitioner thoroughly investigated Tri-Power's reserves.  As an initial matter, petitioner's acquisition team reviewed all of the property information, including the 1986 LAM reserve report, provided along with TPC's offer.  Petitioner then commissioned LAM to prepare an updated reserve report, rolling forward its earlier projections to November 1986.  In addition, Messrs. Billings and Wagner traveled to Houston to interview Tri-Power's personnel and evaluate the reserves.  During these visits, Mr. Billings and Mr. Cassell reviewed, in detail, the geological and seismic data relating to Tri-Power's reserves and the 1986 LAM reserve report.  Mr. Billings also met with Mr. Martin to review the Tri-Power reserves included in the 1986 LAM reserve report. Mr. Wagner met with Tri-Power's landman, Mr. Vandergriff, and reviewed Tri-Power's land files.  In-house geologists and engineers also reviewed the reserve data.  Finally, petitioner used in-house personnel as well as an outside oil and gas

attorney, Mr. Swonke, to conduct title and lease reviews on the Tri-Power properties. On the basis of the foregoing, we conclude that petitioner's investigation of Tri-Power's reserves equaled, if not exceeded, petitioner's investigation of Tri-Power's NOL's.

Respondent, however, is critical of petitioner's reliance on the 1986 LAM reserve reports. Respondent contends that it was absurd for petitioner to rely solely on the seller's reserve report without an independent verification. We disagree. LAM was an independent engineering firm, experienced with Tri-Power's reserves. Moreover, it was petitioner's standard practice to use the seller's updated (i.e., rolled-forward) reserve report to evaluate potential acquisitions, and that practice was standard in the industry. Next, respondent contends that the 1986 LAM updated reserve report was unreliable because (1) it did not take into account the 1986 updated production data, and (2) it included several wells with little to no production history. Respondent suggests that petitioner willingly disregarded 1986 updated production data because it would have resulted in a lower reserve valuation. The 1986 updated production data, however, was available to petitioner during its investigation of Tri-Power's reserves. Petitioner was also aware that the 1986 LAM reserve reports included wells with little to no production history. Accordingly, petitioner had all the information necessary to make its own determination concerning the value of

Tri-Power's reserves.  Moreover, we find nothing to suggest that petitioner disregarded the 1986 updated production data.  To the contrary, we believe that petitioner considered all of the available information in making its decision to acquire Tri-Power.

### Letters of Intent

Respondent next argues that petitioner's letters of intent indicate that tax considerations predominated in the acquisition. Petitioner, in its October 22, 1986, letter of intent, conditioned the acquisition on, inter alia, the receipt of a favorable opinion from its tax adviser.  The condition states as follows:

> Plains will not consummate the transaction contemplated hereby until it receives an opinion letter from its tax advisor * * * stating the Plains' tax advisor has reviewed all tax information relating to the business of Tri-Power and Tri-Power's predecessors, that the tax returns and data supporting those returns are accurate, complete and verifiable as such and that in such advisor's opinion Plains' acquisition of Tri-Power as provided for in the definitive Agreement should achieve the tax consequences intended by the parties thereto.

Respondent contends that the above-quoted provision demonstrates that petitioner would not have consummated the acquisition unless petitioner had some assurance that it would be able to use Tri-Power's NOL's.  Respondent argues that this fact alone demonstrates that tax avoidance was the primary purpose for the acquisition.  We do not agree.  The letter of intent merely

confirms the fact that petitioner considered the tax consequences of the acquisition, a fact that petitioner does not deny. Petitioner's consideration of the tax consequences of the acquisition, as discussed supra, does not mandate the application of section 269. See D'Arcy-MacManus & Masius, Inc. v. Commissioner, 63 T.C. at 451. Moreover, the condition was not binding. Nothing in the letter of intent would have prevented petitioner from waiving the condition and going forward with the acquisition in the event that it received an unfavorable tax opinion but still desired to acquire Tri-Power.

Respondent further contends that petitioner's failure to include in its letter of intent a similar escape clause allowing it to back out of the acquisition if the reserves did not measure up is clear evidence that tax considerations predominated. We disagree. Petitioner was in the oil and gas business, not the tax business. Accordingly, it was not only necessary, but prudent, for petitioner to seek an outside opinion concerning the tax aspects of the acquisition. An outside opinion concerning the reserves was unnecessary because petitioner's acquisition team, through its own investigation, was already familiar with the 1986 LAM reserve reports and their limitations. Accordingly, we find that the absence of an escape clause concerning the reserves does not evince a tax avoidance purpose.

Value of Tri-Power's Reserves

Respondent contends that petitioner paid more for Tri-Power than its assets were worth.  Both parties presented expert witness testimony concerning the value of the Tri-Power reserves. It is well established that we may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we will accept.  See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938).

Respondent's experts estimate the fair market value of the Tri-Power reserves, at the time of the acquisition, to be in the range of $4.1 million to $6.2 million.  Petitioner's expert estimates the fair market value of the Tri-Power reserves, at the time of the acquisition, to be in the range of $11.6 million to $13 million.  The 1986 LAM updated reserve report estimated the future net revenue from the Tri-Power reserves to be approximately $19.1 million, using a discount factor of 10 percent.  Respondent contends that the fair market value estimated by petitioner's expert and the estimated future net revenue estimated by LAM in the 1986 LAM updated reserve report are overstated because they (1) are based on overstated reserve estimates, (2) employ an overly optimistic price forecast to project the future cash-flows anticipated from the reserves, and (3) used an improper discount factor to discount the estimated

future cash-flow to its present value. Respondent contends that the proper discount factor is 20 percent.

Overall, we believe that the 1986 LAM updated reserve report, made coincident to the acquisition, is the best estimate of the value of the Tri-Power reserves at the time of the acquisition. Not only was LAM familiar with the properties, but LAM had available information that has since been lost. Accordingly, we find the estimated reserves, as set forth in the 1986 LAM updated reserve report, to be the most reliable estimate of the reserves. Moreover, the oil and gas price forecast provided by petitioner to LAM for use in the rollforward fell within the range reported in the 1986 SPEE survey. As discussed supra in our findings of fact, petitioner's price forecast was within one standard deviation of the 1986 SPEE mean. Accordingly, we reject the notion that the price forecast used in the 1986 LAM updated reserve report was overly optimistic. Finally, the 1986 LAM updated reserve report included a schedule showing a range of present worth estimates using different discount rates. LAM estimated the present net worth of Tri-Power's proved and producing reserves to be $14,447,362, using a 20-percent discount rate. Even if we accept respondent's assertion that 20 percent is the proper discount factor, the record supports a finding that petitioner paid $9.75 million for stock in a corporation with assets having a value of at least

$9.75 million, if not more. Consequently, we conclude that petitioner did not pay more for Tri-Power than its assets were worth.

Additionally, we note that petitioner's acquisition of Tri-Power was competitive with other acquisitions that took place during the fourth quarter of 1986. Petitioner paid $4.64/BOE ($9.75 million ÷ 2.1 million BOE) to acquire the Tri-Power reserves. Accordingly, the price per BOE paid by petitioner for the Tri-Power reserves was below the fourth quarter 1986 median of $6.45/BOE reported by Strevig in its 1986 fourth quarter report and below the revised fourth quarter 1986 median of $5.18/BOE reported by Strevig during February 1992. Accordingly, petitioner actually acquired the Tri-Power reserves at a discount rather than a premium as respondent contends.

### Size of Tri-Power's NOL's

Respondent contends that the sheer enormity of Tri-Power's NOL's in comparison to the value of its assets and their income-producing potential indicates the primacy of tax motivations. Respondent stresses the fact that by the end of 1993, petitioners used almost $55 million of the Tri-Power NOL's but had yet to recoup their $9.75 million investment through the cash-flow of the Tri-Power properties. Respondent further emphasizes that, as a result of the NOL carryforwards in issue, petitioner paid no regular Federal income tax during the period 1987 to 1993.

Accordingly, respondent contends that the tax benefits of the transaction exponentially dwarfed both the potential and actual business advantages of the acquisition and dropdown.  Petitioner contends that respondent's argument is based in substance on old section 269(c), which was repealed by Congress during 1976.  See Tax Reform Act of 1976, Pub. L. 94-455, sec. 1901(a)(38), 90 Stat. 1771.[33]

The magnitude of the NOL's in issue supports an inference that the acquisition and dropdown were undertaken, at least in part, for the purpose of securing a tax benefit.  We are not persuaded, however, that the size of the NOL's alone calls for a finding that petitioner's primary purpose for the transactions in

-----

[33]    Prior to its repeal, old sec. 269(c) read as follows:

    SEC. 269(c).  Presumption in Case of Disproportionate Purchase  Price.--The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate--

        (1)  of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or the property acquired specified in paragraph (2) of subsection (a), and

        (2)  of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax.  This subsection shall apply only with respect to acquisitions after March 1, 1954.

issue was to secure the benefit of Tri-Power's NOL's. To the contrary, after careful scrutiny of all the facts and circumstances surrounding the transactions in issue, we conclude, as discussed supra, that business considerations were the principal purpose for the acquisition and dropdown.

### Postacquisition Pursuit of the Acquired Properties

Respondent argues that, after the acquisition, petitioner did not vigorously exploit the Tri-Power properties. We disagree. Although petitioner ultimately sold or abandoned many of the Tri-Power properties, we believe that petitioner's pursuit of the Tri-Power properties is wholly consistent with its contention that obtaining the reserves was the primary purpose for the acquisition.

### The Tri-Power NOL's Distort Petitioner's Tax Liability

Respondent contends that the acquisition and dropdown are precisely the type of abusive transactions that section 269 was designed to attack because the NOL's in issue distort petitioner's tax liability. The purpose of section 269 is to render ineffective "arrangements distorting or perverting deductions, credits, or allowances so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which they were provided." S. Rept. 627, supra, 1944 C.B. at 1016. Section 1.269-2(b), Income Tax Regs., indicates that section 269 applies

when the effect of the deduction, credit, or other allowance would be to distort the liability of the taxpayer, as evidenced by, inter alia, the "unreal or unreasonable relation which the deduction, credit, or other allowance bears to the transaction." Respondent contends that the NOL's in issue have an "unreal or unreasonable relation" to the acquisition in issue. We disagree. Petitioner acquired a going concern, actively engaged in the same line of business as petitioner. After the acquisition and dropdown, petitioner continued to operate the Tri-Power properties along with the dropdown properties. Accordingly, we do not believe that the acquisition and dropdown distorted the NOL's in issue "so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them". For the same reasons, we do not believe that the NOL's bear an "unreal or unreasonable relation" to the acquisition and dropdown.

### Section 1.269-3, Income Tax Regs.

Next, respondent turns to the regulations for support. Section 1.269-3(b)(1) and (c)(2), Income Tax Regs., provides that, in the absence of additional evidence to the contrary, the following transactions are ordinarily indicative that the principal purpose for the acquisition was evasion or avoidance of Federal income tax:

(1)  A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit, or other allowance into conjunction with the income.  * * *

*       *       *       *       *       *       *

(2)  A subsidiary corporation, which has sustained large net operating losses in the operation of business X and which has filed separate returns for the taxable years in which the losses were sustained, acquires high earning assets, comprising business Y, from its parent corporation. The acquisition occurs at a time when the parent would not succeed to the net operating loss carryovers of the subsidiary if the subsidiary were liquidated, and the profits of business Y are sufficient to offset a substantial portion of the net operating loss carryovers attributable to business X * * *.

Respondent contends that these regulations perfectly describe petitioner's acquisition of Tri-Power and subsequent transfer of its oil and gas properties to Tri-Power.  The acquisition and subsequent dropdown do arguably fall within the cited examples and might "ordinarily", absent contrary evidence, lead to the conclusion that a tax avoidance purpose exists.  In the instant case, however, additional evidence to the contrary exists, and that evidence indicates that business considerations, not evasion or avoidance of Federal income tax, were the principal purpose for the transactions in issue.

### Circumvention of the Consolidated Return Regulations

Finally, respondent contends that, through the dropdown, petitioners sought to circumvent the separate return year limitation rules in the consolidated return regulations. Pursuant to section 1.1502-21A(c), Income Tax Regs., pre-acquisition losses can be carried forward and used on the consolidated return only to the extent that the corporation that incurred the losses has current income reflected on the consolidated return. Respondent contends that the dropdown renders this limitation meaningless, and that section 269 should be applied to avoid frustration of the regulation's purpose. The application of section 269, however, requires a finding that the primary purpose for the acquisition was to evade or avoid Federal income tax by securing the benefit of a deduction, credit, or other allowance. We concluded, supra, that the acquisition and dropdown were principally motivated by business considerations, and that petitioner did not have as its principal purpose the avoidance or evasion of Federal income tax by securing a deduction, credit, or other allowance. Absent the requisite intent, section 269 simply does not apply.

We conclude, as discussed supra, that business considerations predominated in the acquisition and dropdown in issue. Accordingly, section 269 does not operate to disallow petitioner's use of Tri-Power's NOL's.

## II.  Penalties

The remaining issue we must decide is whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a).  Respondent determined that petitioners are liable for section 6662(a) accuracy-related penalties for 1991, 1992, and 1993.  The penalties were determined with respect to the section 269 issue (i.e., the disallowed NOL deductions), as well as the adjustments conceded by petitioners in the petition.  Because we held supra that section 269 does not operate to disallow petitioners' use of Tri-Power's NOL's, the only issue remaining to be decided is whether petitioners are liable for section 6662(a) accuracy-related penalties with respect to the adjustments conceded in the petition.

Section 6662(a) imposes a penalty equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in subsection (b).  Respondent contends that the section 6662(a) penalty for 1992 was due to negligence or disregard of rules or regulations and that the section 6662(a) penalties for 1991, 1992, and 1993 were based on substantial understatements of income tax.  See sec. 6662(b)(1) and (2).

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  See sec. 6664(c)(1).

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs.[34] The most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. See id.

Petitioners contend that the accuracy-related penalties are inappropriate in the instant case because they relied on their C.P.A., Arthur Andersen, to prepare their returns accurately. Generally, the duty of filing accurate returns cannot be avoided by placing the responsibility on a tax return preparer. See Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). Reliance on a qualified adviser, however, may demonstrate reasonable cause and good faith if the evidence shows that the taxpayer contacted a competent tax adviser and provided the adviser with all the necessary and relevant information. See Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982); Magill v. Commissioner, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); Pessin v. Commissioner, 59 T.C. 473, 489 (1972).

---

[34] Sec. 1.6664-4, Income Tax Regs., revised Apr. 1, 1995, applies to returns the due date of which (determined without regard to extensions of time for filing) is on or before Sept. 1, 1995. See sec. 1.6664-1(b)(2), Income Tax Regs.

We believe that petitioners acted with reasonable cause and in good faith in their reliance on Arthur Andersen in connection with the preparation of their returns for the years in issue. Arthur Andersen, an accounting firm having substantial experience in the oil and gas industry, qualifies as a competent tax adviser in the instant case. Moreover, petitioners provided Arthur Andersen with their schedules and workpapers for use in the preparation of their Federal corporate income tax returns. Additionally, Arthur Andersen had access to all of petitioners' books and records. There is nothing in the record to indicate that petitioners withheld any relevant information from Arthur Andersen. Respondent suggests that, because petitioners were short staffed during the years in issue, petitioners devoted less time and resources than usual to their return preparation activities. We disagree. When commitments created by numerous acquisitions left petitioners without the necessary accounting staff required to assist in the preparation of their Federal corporate income tax returns, petitioners engaged a C.P.A. to prepare certain schedules and workpapers for review by Arthur Andersen. Accordingly, we believe that petitioners made significant efforts to assess their proper tax liability. Consequently, we hold that petitioners are not liable for the accuracy-related penalties under section 6662(a) for the years in issue.

We have considered the parties' remaining arguments and find them to be either without merit or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.